**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Kaori Stearney, et al.,

          Plaintiffs,

v.

United States of America,

          Defendant.

No. CV16-8060-PCT-DGC

**ORDER**

On the night of March 28, 2014, on the Navajo Nation reservation, a drunk driver collided with a van containing the Hirayama family. Father Tomohiro, mother Sachiyo, son Yuki, along with the drunk driver and his passenger, all died in the crash. Only nine-year-old R.H. survived. Plaintiff Kaori Stearney, on behalf of R.H. and as administrator of Yuki's estate, brought wrongful death, negligence, and negligent infliction of emotional distress claims against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.* ("FTCA"). Plaintiff alleges that the Navajo Nation Police Department negligently caused the accident by pursuing the drunk driver.

The Court held a bench trial on April 16-24, 2019, and now finds in favor of Plaintiff on all claims except negligent infliction of emotional distress. Applying apportionment of fault principles of Arizona law, as required under the FTCA, the Court assigns 90% of the fault to the drunk driver who hit the Hirayama family and 10% to the United States, and awards $1,102,872 in damages against the United States.

# I.    Background.

This order sets forth the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure. The Court provides some citations to the record, but the citations should not be regarded as the sole basis for the Court's ruling. The Court's findings and conclusions are based on all of the testimony and exhibits admitted during the trial.

## A.    The Relevant Terrain.

U.S. Highway 160 is a two-lane road that runs in an east-west direction across the Navajo reservation between Tuba City and Kayenta, in northern Arizona. Tuba City is home to about 8,600 residents.

Several features of Highway 160 are relevant. Near milepost ("MP") 322 in Tuba City, Warrior Drive forms a three-way T-junction with Highway 160. Ex. 143. Further east, at MP 344, the highway begins a downhill grade. The road curves left and, at MP 345, continues in a north-easterly straightway for several miles. Looking down the hill from MP 344, a large dirt mound blocks the view of the highway after MP 345. Ex. 123.

Once on the straightaway after the curve, a rock formation called Elephant's Feet sits on the north side of the road east of MP 345. Exs. 84k, 124. Just east of Elephant's Feet, Indian Route 6011 (a dirt road) runs perpendicular from the south side of the highway. Ex. 143 at 27.

Looking north-east on Highway 160 from MP 345, the highway runs in a straight direction but varies in elevation. The highway at MP 347 is visible on the horizon, but portions of the highway in between are obscured by crests and dips in the road. *See* Court's Livenote Tr. ("Tr.") at Apr. 24, 2019 at 18-27. The accident occurred at MP 346.6.

## B.    The Pursuit.

March 28, 2014 was a clear, cold night, with the moon below the horizon. While patrolling in Tuba City that evening, Navajo Nation Police Sergeant David Butler saw a 2009 Ford F150 crew-cab pick-up truck run a stop sign and proceed through the intersection. Butler, who was coming from the opposite direction, turned his police vehicle

around, activated his emergency lights and sirens, and began to follow the truck. The truck did not pull over, but instead increased its speed and drove around a bend in the road. Butler lost sight of the truck, turned off his emergency equipment, and pulled to the side of the road.

A short time later, a vehicle pulled up to Butler's vehicle and reported that a Ford truck was driving recklessly in a nearby neighborhood, had caused an accident, and had left the scene. As Butler proceeded to the area of the reported accident, he saw the same Ford truck he had seen earlier, but now with only a single operable headlight on the driver's side and an inoperable dangling headlight on the passenger side. Butler again activated his emergency equipment and followed the truck to the T-junction of Warrior Drive and Highway 160.

The truck stopped behind another vehicle at the junction, and Butler pulled behind the truck with his lights flashing and sirens activated. Navajo Nation Police Officer Nicole Yellow arrived shortly thereafter – at about 9:47 p.m. – and pulled along the left side of the truck with her emergency equipment activated. When the vehicle ahead of the truck moved forward, the truck pushed forward and to the left between the cars, nearly hitting Officer Yellow, and turned east onto Highway 160 at MP 322. Butler directed Yellow to hold back so she would not be hit, followed the truck onto eastbound Highway 160, and began his pursuit.

The truck accelerated quickly and pulled away from Butler. Butler drove as fast as he could, but his vehicle's speed governor limited his top speed to 98 mph. The Ford truck pulled away and, according to Butler, had gained three quarters of a mile on Butler by MP 323. Yellow followed Butler, but stopped her pursuit after losing sight of the truck about six miles east of Tuba City. She continued driving east on Highway 160.

Butler continued to follow the truck at high speed with his lights and siren activated. At 9:54 p.m. – about six minutes into the pursuit – Butler gave the truck's license plate information to dispatch and was told that the truck's owner was Yazzie Brown. By 9:57 p.m., Butler suspected that the driver of the truck was Kee Brown and that he was

heading to Cow Springs, Arizona. Butler was correct – the driver was Kee Brown. Butler knew of a prior police department incident with Brown, and requested further information on him. As Butler followed the truck, he saw it swerving in and out of traffic at over 100 mph.

Dividing the distance between where the pursuit started and the crash occurred by the time it took Butler to travel this distance, the Court finds that Butler was driving an average of 94 miles per hour while following the truck. This average includes his start-up time at the beginning of the pursuit, and, as he testified, his slowing to 80 mph on curves and to 40 mph while passing Indian Route 6011. As a result, Butler likely was driving faster than 94 mph for much of the pursuit.[1]

In testimony the Court found credible, defense expert Dr. Joseph Peles testified (consistent with Butler's testimony) that Butler last saw the truck when Butler was at about MP 343.75, just as the highway begins to descend and before it curves left. At that point, Peles testified, the truck would have been at about MP 345.03, and just about to disappear behind the large dirt mound near Elephant's Feet and proceed northeast on the straightaway. Thus, after a 23-mile pursuit, Butler was only 1.28 miles behind the truck, according to Peles.[2]

---

[1] The Court arrives at these speed calculations on the basis of Exhibit 22, which contains entries made by Navajo Nation Police Department dispatchers on the night in question. The exhibit shows that Butler first mentioned his location at Highway 160 at 21:48:15. This presumably was when he and the truck approached or arrived at the T-junction with Highway 160. Officer Yellow appears to have reported that she was eastbound on Highway 160 at 21:48:33. Thus, it is not clear exactly when the pursuit began. If it started when the report was received that Yellow was eastbound on Highway 160 (21:48:33), 15 minutes and 18 second elapsed before Butler reported the accident at 22:03:51. To drive the 24.6 miles from MP 322, where the pursuit began, to MP 346.6, the point of the accident, in 15 minutes and 18 seconds would require an average speed of 96.47 mph (24.6 miles ÷ 15 minutes and 18 seconds x 60 minutes). If the pursuit started at the earlier time reflected in the log of 21:48:15, the average speed would be 94.6 mph. Defendant presented evidence that times reflected in the dispatch log may not be perfectly accurate, but even if the log understates Butler's travel time during the pursuit by 30 seconds (it could just as easily have overstated the time), his average speed would still be almost 92 mph. A reasonable average of these possible speeds appears to be 94 mph.

[2] Dr. Peles was careful to say that he could not be certain of these locations and distances, but they fit all of the facts. His testimony comports with Sergeant Butler's testimony that he last saw what he believed to be the truck's taillights from about MP 344, just as they disappeared around the left-hand curve, which would have been at MP 345.

Meanwhile, the Hirayamas' Chrysler minivan was driving west on Highway 160. R.H. testified that before the crash her father commented, in a rather nervous voice, that he could see flashing lights, and that her brother, Yuki, asked if it was the police. Defense expert Peles places the Hirayama's van at MP 346.8 at this point, a conclusion the Court finds reasonable.

Moments later, the truck crossed the center line going 92 to 100 mph. Tomohiro braked hard from 65 to 41 mph and tried to steer left, but the truck crashed head-on into the Hirayama van at MP 346.6. R.H. awoke to shattered glass, extreme pain, and her family slumped around her. She shook her brother, who moaned but did not move. R.H. screamed for help inside the van. She was removed by Officer Yellow, who arrived at the scene after Sergeant Butler, and was air-lifted to a Flagstaff hospital and later transferred to Phoenix Children's Hospital for emergency surgery.

Tomohiro, 50 years old, Sachiyo, 42, and Yuki, 16, died at the scene, as did Brown and his passenger. A post-mortem toxicology report found that Brown's blood alcohol level was .267, more than three times the legal limit. At the moment of impact, Peles calculates that Butler was approximately 1.5 miles behind Brown.

**C.     The Hirayama Family and R.H.'s Injuries.**

Tomohiro had a bachelor's degree in economics. Before his death, he was 11 months into a five-year contract with the engineering and robotics firm Yaskawa America Inc. at the firm's Waukegan, Illinois office. *See* Ex. 56. He had worked for the parent company, Yaskawa Electric Corporation, for 28 years, including in its Netherland's office for several years.

When Yaskawa employees accept contracts to work outside of Japan, they receive stipends for transportation, housing, education, and family. With all benefits and salary totaled, Tomohiro made between $260,000 and $280,000 annually. Sachiyo previously had worked for Yaskawa, but was a fulltime mother at the time of the accident.

Before moving to Illinois, the Hirayama family lived in Japan and the Netherlands. They were close, taking family trips, traveling abroad, attending baseball games, and

dining out together. They were visiting Arizona to see the Grand Canyon. When R.H. learned of her parents and brother's passing in the hospital, she asked her grandfather why they had left her behind.

R.H. suffered peritonitis from perforation of her stomach and multiple fractures in her shoulder, arms, and legs. She underwent emergency surgery and extensive medical care in Phoenix and Chicago, and returned to Japan with her maternal grandparents.

In Japan, R.H. stopped talking and would often stay in her room and cry. Buddhist tradition dictates that a deceased's remains are to be cremated and placed in urns, and then buried in sacred ground after 49 days. But for three years R.H. would not separate from her family's urns. She permitted the urns to be buried on December 3, 2017, but only after insisting that some of the ashes be kept in a shrine in her grandparents' home. R.H. is now 14 years old.

## II. Liability.

Plaintiff asserts wrongful death claims against the United States for the deaths of Tomohiro, Sachiyo, and Yuki, and a negligence claim for R.H.'s injuries and emotional distress. *See* Docs. 59; 119 at 15.

### A. The FTCA and Arizona Law.

Pursuant to the Indian Self-Determination and Education Assistance Act ("the Act"), Indian tribes may enter into "self-determination contracts" with the United States "for the planning, conduct and administration of programs or services which are otherwise provided to [the tribe] and their members pursuant to Federal law." *Hoopa Valley Indian Tribe v. Ryan*, 415 F.3d 986, 990 (9th Cir. 2005) (quoting 25 U.S.C. § 450f(a)(1)(E), transferred to and amended at 25 U.S.C. § 5321). "Indian tribes . . . and their employees [are] deemed employees of the [U.S. Bureau of Indian Affairs] for purposes of the FTCA when they are carrying out functions authorized in or under a self-determination contract." *Colbert v. United States*, 785 F.3d 1384, 1389-90 (11th Cir. 2015). "These contracts are commonly called '638 contracts,' in reference to the public law number of the [Act]." *Shirk v. United States*, 773 F.3d 999, 1002 (9th Cir. 2014).

Under the FTCA's waiver of sovereign immunity, the United United States may be sued for money damages for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  The United States is liable to the extent "a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  *Id.*  Thus, the parties agree that Arizona substantive law applies to Plaintiff's claims.  *See Delta Savings Bank v. United States*, 265 F.3d 1017, 1024-25 (9th Cir. 2001).

To establish negligence under Arizona law, "a plaintiff must prove: (1) a duty requiring the defendant to conform to a certain standard of care; (2) breach of that standard; (3) a causal connection between the breach and the resulting injury; and (4) actual damages."  *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 827-28 (Ariz. 2018).  An Arizona wrongful death action is a statutory negligence claim requiring a showing that the death was caused by the alleged tortfeasor's breach of a reasonable standard of care.  *See* A.R.S. §§ 12-611, 12-612.

Plaintiff's wrongful death and negligence claims rely on the same underlying conduct – the allegedly improper pursuit of Brown – and she must establish Defendant's breach of a reasonable standard of care.  The Court therefore reaches the following conclusions of law as to all claims, except Plaintiff's negligent infliction of emotional distress claim which is discussed separately.

**B.    Duty and Standard of Care.**

Defendant concedes that it owed a duty to Plaintiff, but the parties disagree on the standard of care that governs pursuits by Navajo Nation police officers acting under a 638 contract.  *See* Doc. 187-1 at 34.

Duty is an "obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm."  *Markowitz v. Ariz. Parks Bd.*, 706 P.2d 364, 366 (Ariz. 1985).  The standard of

care is defined as what the defendant must do, or not do, to satisfy that duty. *Coburn v. City of Tucson*, 691 P.2d 1078, 1080 (Ariz. 1984).

"The standard of care for one who undertakes to render services in the practice of a profession or trade is not the reasonable man standard." *Watson v. Stratton Restoration*, No. 2 CA-CV 2014-0063, 2015 WL 1394755, at *2 (Ariz. Ct. App. Mar. 26, 2015) (citing *Chamber v. W. Ariz. CATV*, 638 P.2d 219, 221 (Ariz. 1981)) (internal quotation marks omitted). "[W]hen a person holds himself out to the public as possessing special knowledge, skill, or expertise, he must perform according to the standard of his profession." *Sw. Auto Painting & Body Repair v. Binsfeld*, 904 P.2d 1268, 1272 (Ariz. Ct. App. 1995). Where "the alleged lack of care occurred during the professional or business activity, the plaintiff must present expert testimony as to the care and competence prevalent in the business and profession." *St. Joseph's Hosp. v. Reserve Life Ins.*, 742 P.2d 808, 816 (Ariz. 1987).

### 1.     The Governing Standard.

Plaintiff argued at trial that all police officers in Arizona – including Navajo Nation officers on the reservation – must follow pursuit termination standards taught by the Arizona Peace Officers Standards and Training Board ("AZPOST"). Those standards are found in AZPOST training materials titled "Classroom Pursuit Lecture." *See* Ex. 20. The relevant portion reads as follows:

VIII.   Termination of a Pursuit

A.      When a decision to terminate a pursuit is reached by whatever method, the termination should be complete and not partial.

B.      Turn off your emergency response equipment and pull over or make an immediate right or left turn.

C.      Do not continue to follow the suspect at any distance or for any reason.

D.      Some agencies have a policy that tells the officer to pull over, exit the vehicle and walk around it. This leaves no doubt that the pursuit was terminated.

Ex. 20.

To show that these materials set the standard of care for Navajo Nation police officers, Plaintiff elicited testimony about Arizona Administrative Code ("AAC") R13-4-103 and R13-4-110, which require all peace officers in Arizona, except elected sheriffs, to obtain certification from AZPOST through a 585-hour training course in which the standard is taught. Ex. 9; *see also* Ex. 13 (R13-4-116, "Academy Requirements"). Plaintiff also asserted that the Navajo Nation's 638 contract requires its police officers to obtain AZPOST certification, cited the BIA's approval of the AZPOST training curriculum, and noted that Butler and Yellow each completed the AZPOST training. Further, Plaintiff's expert, Dr. George Kirkham, testified that well-established national pursuit-termination standards are consistent with the AZPOST training materials and always require that officers deactivate their emergency lights and sirens and stop following the suspect vehicle. Tr. at Apr. 18, 2019 at 35-37.

The Court is not persuaded that the AZPOST training materials set the standard of care for Sergeant Butler and Officer Yellow in this case. As noted above, the Navajo Nation police officers stand in the shoes of BIA officers, and the BIA's Office of Justice Services has issued a Law Enforcement Handbook that sets forth various police policies ("BIA Policy"). Ex. 101; Ex. 4. Section 2-24 of the BIA Policy contains eight pages of guidelines on police pursuits. Ex. 101. Charles Addington, Deputy Bureau Director of the BIA Office of Justice Services, testified at trial that Navajo Nation police officers acting under 638 contracts are required to follow the BIA Policy. *See* Tr. at Apr. 22, 2019 at 10-11. He testified that they act as federal law enforcement officers, not as state officers. *Id.* Sergeant Butler and Officer Yellow also testified that their work is governed by the BIA Policy.

While Arizona law may require AZPOST certification for Arizona peace officers, the Navajo Nation is not governed by state law and its police officers are not municipal or state law enforcement officers. The AZPOST training materials relied on by Plaintiff are

just that – training materials for new police officers. They are not standards implemented by the BIA or the Navajo Nation.[3]

Nor can the Court accept Dr. Kirkham's assertion that the AZPOST training materials reflect an established national standard for the termination of pursuits. On this point, the Court found the testimony of defense expert William Katsaris more credible. *See* Tr. Apr. 22, 2019 at 52-53. He testified that there is no national standard for the termination of police pursuits – that individual agencies set their own policies in conformance with governing law and local circumstances.

The Court finds that the BIA Policy governed the actions of Sergeant Butler and Officer Yellow on the night of March 28, 2014. The Court accordingly must examine the policy to determine what it requires for the termination of pursuits.

### 2. The BIA Policy On Pursuits.

The BIA Policy's section on pursuits begins with this cautionary declaration: "The protection of life, both civilian and law enforcement, is the foremost concern that governs this policy. Officers must balance the need to stop a suspect against the potential threat to themselves and the public created by a pursuit or apprehension." Ex. 101 at 1. The policy explains that "[a] vehicle pursuit is a use of force. When an officer elects to use this force, he/she must use the same objective reasonableness standard he/she uses when force is used in the course of accomplishing police duties." *Id.* (§ 2-24-03(A)).

A pursuit begins when a suspect vehicle "actively attempts to elude the officer and displays any sign of reckless driving, such as accelerating to speeds above the speed limit, running stop lights/signs, [and] weaving hazardously between other vehicles." Ex. 101 at 2 (§ 2-24-02(B)). Recognizing the inherent risk of police pursuits, the policy states that

---

[3] Nor do they appear to set the standard for all state and local law enforcement officers in Arizona. The training materials specifically note that "[s]ome agencies have a policy that tells the officer to pull over, exit the vehicle and walk around it." Ex. 20, at VIII(D). This language suggests that the different agencies may have different policies. Consistent with this notion, Arizona Department of Public Safety ("DPS") Officer Dennis Milius, who conducted an investigation of the Hirayama accident, testified that he is required to follow DPS pursuit policies.

"[i]n most instances the officer should discontinue attempting to stop the vehicle, unless pursuit guidelines are applicable." *Id.*

The BIA Policy provides firm direction on terminating pursuits: "In all areas of the jurisdiction, officers are expected to *end their involvement in a pursuit* whenever the risks to their own safety or the safety of others outweigh the danger to the community if the suspect is not apprehended." *Id.* at 2 (§ 2-24-04) (emphasis added). Supervisors – like Sergeant Butler – are directed to "continually weigh the risks" of a pursuit and to "immediately terminate the pursuit" when they "judge the risk created by the continuation of the pursuit to the public, the officers, or the suspects, to be greater than the risk created to the public by the suspect's escape or delay in capture." *Id.* at 3-4 (§ 2-24-05(D)). The policy contains a list of ten factors for officers and supervisors to consider "before engaging in and while continuing a pursuit." *Id.* (§ 2-24-04). Those factors will be discussed below.

The BIA Policy does not, like the AZPOST training material, set forth specific steps an officer must take to terminate a pursuit. But the policy does require that officers "end their involvement in the pursuit." *Id.* at 2. This language suggests that the officers must stop doing the thing that constitutes a pursuit – driving at high speed behind a suspect who is attempting to elude them, with emergency equipment activated.

Defendant disagrees, and argues that the BIA Policy permits officers to continue following a suspect after they have terminated a pursuit. For support, Defendant cites a section of the BIA Policy titled "Post Pursuit Operations." *Id.* at 8 (§ 2-24-10). This section states: "When a decision is made to terminate a pursuit, officers will continue efforts to identify, locate, and apprehend the suspect." *Id.* (§ 2-24-10(A)). Defendant interprets this language to mean that officers may continue following a suspect at high speed with their lights and sirens activated. But such an officer has not terminated the pursuit. He continues to do the very thing that constitutes the pursuit. The title of this section – "Post Pursuit Operations" – shows that it concerns steps officers should take *after* a pursuit has ended. A more reasonable reading of this section is that officers must, after

they "end their involvement in the pursuit" (*id.* at 2), make efforts to identify, locate, and apprehend the suspect by other means.

In sum, as Navajo Nation officers acting under a 638 contract and the BIA Policy, Sergeant Butler and Officer Yellow had a duty to terminate their pursuit of the truck once the risk to the public from the pursuit outweighed the risk from the driver's escape or delayed apprehension. Under the policy, they were required to "end their involvement in [the] pursuit." Ex. 101 at 2.

## C. Breach.

The Court does not find that Officer Yellow breached her duty under the BIA Policy. She did not continue pursuing the truck at high speed with her emergency equipment activated, but instead slowed considerably until she was several miles behind. Plaintiff's police practices expert, Dr. Kirkham, testified that Officer Yellow was too far behind Butler to have played any role in the accident. Tr. at Apr. 18, 2019 at 78, 90-91. The rest of this order, therefore, will focus on the actions of Sergeant Butler.

To establish breach, a plaintiff must show that the defendant's actions fell below the standard of care. *Rudolph v. Ariz. B.A.S.S. Fed.*, 898 P.2d 1000, 1004 (Ariz. Ct. App. 1995). "Whether the defendant has met the standard of care – that is, whether there has been a breach of duty – is an issue of fact that turns on the specifics of the individual case." *Gipson*, 150 P.3d at 230. "A breach of care typically cannot be presumed 'from the mere fact that an accident has occurred or that an injury has been sustained.'" *Moro*, 2011 WL 662925, at *4 (quoting *Nieman v. Jacobs*, 347 P.2d 702, 704 (Ariz. 1959)).

### 1. Did Butler Have a Duty to Terminate His Pursuit of Brown?

The BIA Policy requires officers to consider ten factors in determining whether the danger to the public from a pursuit outweighs the risks to the public if the suspect escapes or apprehension is delayed. *See* Ex. 101 at 2-3. The Court will review these factors to determine whether Butler should have terminated his pursuit of the truck.

/ / /

/ / /

- 12 -

### a.    Seriousness of the Crime.

The truck ran a stop sign without slowing down or stopping, requiring that other traffic entering the intersection stop to avoid a collision.  It was then involved in a hit-and-run accident that resulted in damage to the passenger side headlight.  Katsaris testified that Brown's total disregard of the stop sign followed shortly by the hit-and-run were serious events showing Brown's recklessness and the need for apprehension.  Tr. at Apr. 22, 2019 at 69-70.  The Court agrees that the truck's actions in Tuba City presented a threat to public safety and initially weighed in favor of pursuing and apprehending the driver.

But Butler was required by the BIA Policy to continually assess the risks posed by his pursuit.  Once the truck entered Highway 160, accelerated to over 100 mph, and began weaving in and out of traffic, two things were apparent.  First, Butler would not be able to overtake the truck and get it off the road, so continued pursuit would not eliminate the threat to the public posed by the reckless driving observed in Tuba City.  Indeed, Butler testified that at MP 323 – one mile into the pursuit – he knew he was not going to catch up with the truck. *See* Tr. at Apr. 16, 2019 at 51.  Second, the truck was even more of a threat to the public swerving through traffic at 100 mph.  Thus, although the seriousness of Brown's crimes in Tuba City certainly justified an initial attempt to apprehend him, it did not justify continuing a pursuit that offered no prospect of apprehending him and only increased the risk to the public.  This factor weighed against continuing the pursuit.

### b.    Potential for Apprehending by Other Means.

Butler had to consider the potential for apprehending the truck's driver by other means.  Within six minutes of beginning the pursuit, Butler had the truck's license plate information and knew the identity of the vehicle's owner.  Three minutes later, Butler suspected the driver was Kee Brown heading to Cow Springs.  Thus, Butler had at least some other means of attempting to apprehend Brown for his reckless driving.  He could have proceeded to Cow Springs and attempted to locate Brown and investigate his actions that evening.  This certainly did not guarantee apprehension, but neither was Butler

completely lacking in other means to attempt to bring the driver to justice. Given that a continued pursuit offered no prospect of overtaking the truck, this was clearly the better option. The second factor weighed against continuing the pursuit.

### c. Pedestrian and Vehicle Traffic in the Pursuit Area.

No evidence shows that there was pedestrian traffic on Highway 160. Butler testified that traffic was light to medium, and that he saw the truck weaving around other vehicles along the pursuit route. While light to medium traffic surely presented less of a risk than a crowded highway, other vehicles were present and were threatened by the truck's actions. This factor weighed against continuing the pursuit.

### d. Potential Risk to Citizens Using the Highway.

Once on Highway 160 with Sergeant Butler in pursuit, the truck drove more than 35 mph above the posted speed limit. Butler knew the truck was driving faster than 98 mph on a two-lane highway and was weaving around traffic with only a single headlight on a dark night. This presented a substantial risk to citizens on the highway and weighed against continuing the pursuit.

### e. Traffic, Weather, and Road Conditions.

The fifth through seventh factors consider traffic conditions, including the presence of traffic control devices; weather; and road conditions, including visibility. Ex. 101 at 3. There were no traffic control devices on this stretch of highway, the streets were paved, and the weather was cold and dry. Visibility was not impaired by weather, but it was dark, with no moon.[4] The darkness increased the risk presented by the pursuit, particularly since the truck had only one headlight. An oncoming driver would have difficulty discerning the size and location of the truck, and it could be mistaken for a motorcycle. Indeed, Dr. Peles testified that Brown's single headlight at higher speeds made it difficult for other drivers to see his approaching car and accurately gauge his distance. Tr. Apr. 24, 2019 at

---

[4] Katsaris testified that the moon was out to light the road on March 28, 2014. *See* Tr. at Apr. 22, 2019 at 75. But Defendant's accident reconstruction expert, Dr. Peles, testified that on the night of the accident the moon was below the horizon. Tr. at Apr. 24, 2019 at 45. The Court finds Peles more credible on this point.

52.  Officer Milius provided similar testimony.  While the other conditions did not increase the risk, neither did they eliminate the risk of a one-light truck weaving through traffic at 100 mph on a dark night.  Tr. at Apr. 22, 2019 at 75.  Visibility weighed against continuing the pursuit, and the other factors were neutral.

### f.        Risk to the Public if Suspect Escaped.

The truck clearly posed a risk to the public if the driver was not apprehended.  Butler had seen it drive dangerously in Tuba City and knew it had been in an accident.  But within a mile after the pursuit began on Highway 160, Butler knew he could not overtake the truck.  Therefore, continued pursuit would not eliminate the risk the truck presented to the public if it was not apprehended, and the pursuit itself would only increase the risk.  The Court accepts Dr. Kirkham's opinion that a reasonable officer's focus would have shifted to slowing down, backing off, and changing his conduct to encourage the truck to slow down.  *See* Tr. at Apr. 18, 2019 at 38, 49.  This factor was at best neutral.

### g.        Known or Ascertainable Identity of the Suspect.

Within nine minutes of the pursuit's start, Butler knew the truck's owner and suspected, correctly, that the driver was Kee Brown.  As discussed above, this factor weighed against continuing the pursuit.

### h.        Suspect's Manner of Driving.

The BIA Policy directs officers to assess several considerations in evaluating a fleeing suspect's manner of driving.  *See* Ex. 101 at 3.

Speed being driven:  The truck's speed was over 100 mph.

Regard for other traffic:  The truck's driver showed no regard for other traffic.  He blew through a stop sign in Tuba City, fled from an accident, drove at extremely high speeds while weaving in and out of traffic, and nearly hit Officer Yellow as he turned onto Highway 160.

Regard for traffic control devices:  The truck disregarded the stop sign in Tuba City.  No evidence shows that traffic controls were present on Highway 160.

Driver's control of the fleeing vehicle:  The truck had already been involved in a hit-and-run accident.  Additionally, whether or not Butler could tell that the driver of the truck was impaired, his control was clearly diminished at 100 mph, with a large truck, weaving through traffic, on a dark night and a two-lane road with curves and hills.  In fact, Officer Yellow testified that she was afraid to drive more than 75 or 85 mph on this stretch of highway due to its curves and hills.

Type and condition of the fleeing vehicle:  The truck was a Ford F150 crew-cab pick-up.  Nothing suggests that a vehicle this large could be driven safely at 100 mph, including with a single operable headlight.

Age to the suspect, if known:  This factor is not relevant.

Considered together, these factors highlighted the risk posed to the public by the pursuit.  This factor weighed against continuing the pursuit.

### i.     Conclusion.

Each of the ten factors in the BIA Policy either weighed against continuing the pursuit or were neutral.  None favored continuing the pursuit.  Even with due regard for Sergeant Butler's judgment, the Court finds that the BIA Policy required him to end the pursuit.

### 2.     Butler Failed to Terminate His Pursuit of Brown.

Defendant argued at trial that Butler terminated his pursuit at MP 323 when the truck pulled ahead of him, but the evidence does not support this assertion.  The BIA Policy required Butler to "end [his] involvement" in the pursuit, or, as supervisor, to "immediately terminate the pursuit."  Ex. 101 at 2-3.  Butler did neither.  He followed the truck at an average speed of 94 miles per hour for 24.6 miles with his lights and siren activated, keeping within sight of the truck's taillights until shortly before the accident.  When he lost sight, he was only 1.28 miles back.  And as evidenced by Tomohiro's observation of police lights just before the accident, Butler's lights were well within the visibility of the truck on this dark night.  The lights may have been obscured from time to time by hills or curves, but they were within the truck's sight on straighter portions of the highway.

In short, Butler did not terminate the pursuit. Even if the Court were to accept defense expert Katsaris's testimony that a pursuit can be ended under the BIA Policy by falling back 2.5 to 3 miles, Butler did not terminate.[5] The Court finds that Butler breached the BIA Policy's standard of care by failing to terminate the pursuit when the risks posed by continuing it outweighed the risk to the public from the truck driver's escape or delayed apprehension.[6]

**D.    Causation.**

**1.    Relevant Legal Standards.**

"Actual" or "but for" cause "exists if the defendant's act helped cause the final result and if that result would not have happened without the defendant's act." *Ontiveros v. Borak*, 667 P.2d 200, 205 (Ariz. 1983). The defendant's act "need not have been a large or abundant cause of the final result" – liability exists "even if that conduct contributed only a little to plaintiff's injuries." *Id.* (internal quotation marks omitted); *Dupray v. Jai Dining Servs., Inc.*, 432 P.3d 937, 942-43 (Ariz. Ct. App. 2018) (citing *Ontiveros*, reiterating that a "defendant is liable even if his conduct contributed 'only a little' to the plaintiff's injuries").

A proximate cause of an injury is "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Cloud v. Pfizer Inc.*, 198 F. Supp. 2d 1118, 1138 (D. Ariz. 2001) (quoting *Robertson v. Sixpence Inns of Am., Inc.*, 789 P.2d 1040, 1047 (Ariz. 1990)). In other words, a plaintiff "'must show some reasonable connection between

---

[5] Katsaris testified that to "immediately terminate the pursuit" as the policy requires (Ex. 101 at 4), officers should "back[] off and creat[e] distance to allow the [suspect] to slow down by not pressing [and] being directly behind him." Tr. at Apr. 22, 2019 at 143-144. He stated that there was "some validity to the fact that the greater distance [officers] create between the two vehicles would give [the suspect] a feeling of safety." *Id.* at 144. Katsaris testified that if an officer "showed that he was creating distance" by falling back two and a half to three miles behind the suspect, then the officer would have followed the BIA Policy. *Id.*

[6] Although Butler testified during trial and in his deposition that he terminated the pursuit at MP 323, he did not state in his report of the incident or in his post-accident interview that he terminated the pursuit. And Officer Yellow testified that Butler, who was her supervisor, never told her the pursuit was terminated.

- 17 -

defendant's act or omission and plaintiff's damages or injuries.'" *Garrett v. Woodle*, No. CV-17-08085-PCT-BSB, 2018 WL 6110924, at *6 (D. Ariz. Nov. 21, 2018) (quoting *Robertson*, 789 P.2d at 1047). Foreseeability of the potential harm "often determines whether a defendant . . . 'proximately caused injury to a particular plaintiff.'" *Moro*, 2011 WL 662925, at *4 (quoting *Gipson*, 150 P.3d at 231).

"An act that is the actual cause of injuries will also be the proximate cause unless an intervening event supersedes the defendant's liability for the injuries." *Dupray*, 432 P.3d at 943. An event "is intervening if it has an independent origin for which the defendant is not responsible, and superseding if it "was unforeseeable by a reasonable person in the position of the original actor" and "looking backward, after the event, the intervening act appears extraordinary." *Id.* (quoting *Ontiveros*, 667 P.2d at 206); *see also McMurtry v. Weatherford Hotel*, Inc., 293 P.3d 520, 532 (Ariz. Ct. App. 2013) ("An original actor may be relieved from liability for 'the [injury] when, and only when, an intervening act of another was unforeseeable by a reasonable person in the position of the original actor[.]'").

## 2. Analysis.

Defendant argues that there is no evidence Brown knew he was being pursued by Butler. The Court does not agree. Brown fled from Butler in Tuba City after Brown ran the stop sign and Butler turned his vehicle, activated his emergency equipment, and began to follow. When Butler found Brown a second time after he had caused the hit-and-run accident, Brown fled again. With Butler directly behind him and Yellow at his side, their lights and sirens fully activated, Brown drove aggressively to get onto Highway 160, almost hitting Yellow. Brown then increased his speed as Butler started to pursue him, weaving in an out of traffic. The Court finds by a preponderance of the evidence that Brown fled from Butler.[7]

---

[7] This finding is consistent with the BIA Policy, which identifies reckless driving, accelerating above the speed limit, running traffic controls, and weaving as indicia of flight and an "active[] attempt to elude the officer." *See* Ex. 101 at 2 (§ 2-24-02).

1    The Court also finds that Brown continued to flee from Butler until he hit the

2    Hirayama family. Evidence supporting this finding includes the following: Butler never

3    turned off his emergency equipment; Butler pursued Brown at an average speed of more

4    than 94 mph; Butler remained within 1.28 miles of Brown until moments before the crash;

5    Brown drove at a high rate of speed for the full 24.6 miles; and Brown could see Butler's

6    lights in his rearview mirrors.[8]

7         The Court finds that Brown was fleeing from Butler at the point where he collided

8    with the Hirayama family. As noted, Defendant's expert, Dr. Peles, estimated that Butler

9    was only 1.28 miles behind Brown when Brown was at MP 345. Although it appears that

10   Brown lost sight of Butler at this point due to the road's left turn and the large mound of

11   earth, Brown was then only 1.6 miles – and, according to Peles, 56.4 seconds – from the

12   collision. No evidence suggests that this distance or time was sufficient for Brown to

13   conclude that Butler no longer was following him. To the contrary, the only evidence on

14   this issue was presented by defense expert Katsaris and suggested that a distance of 2.5 to

15   3 miles was required before the effects of a pursuit would cease. At the point of impact,

16   Peles places Butler just 1.5 miles behind Brown. *See* Tr. at Apr. 24, 2019 at 39-41. His

---

18   [8] That Butler's lights could be seen for at least two miles on this clear, dark night is
     demonstrated by the fact that Tomohiro saw the lights from two miles away just before the
19   crash. Dr. Peles opined that at this point Butler was at MP 344.8 and Tomohiro was at
     MP 346.8.

20       Defendant contends that there is no evidence the truck had rearview mirrors. But
     the Court finds by a preponderance of the evidence that it did, based on the following
21   evidence: Dr. Kirkham testified that the law requires such mirrors, that rearview mirrors
     are standard equipment on a Ford F150, and that there is a statistical probability that the
22   truck had mirrors. Additionally, Brown sped away from Butler at the stop sign, at the
     T-junction, and on Highway 160, all suggesting he could see Butler's police unit and lights
23   in his rearview mirrors.

24       Defendant argued at trial that Plaintiff committed spoliation of evidence when she
     failed to preserve the truck and notify Defendant that she planned to inspect it, thereby
25   depriving Defendant of the chance to determine whether the truck had mirrors. *See* Tr. at
     Apr. 24, 2019 at 106; *see also* Doc. 187-1 at 33. Defendant asks that the Court draw an
26   adverse inference against Plaintiff – presumably that the truck had no mirrors. But adverse
     inferences based on spoliation of evidence generally require some showing of culpability
27   on the part of the alleged spoliator. *See Surowiec v. Capital Title Agency, Inc.*, 790 F.
     Supp. 2d 997, 1010 (D. Ariz. 2011); *c.f.* Fed. R. Civ. P. 37(e)(2). Defendant has made no
28   showing that Plaintiff acted culpably in failing to preserve the truck. Nor has Defendant
     presented evidence that Plaintiff controlled the truck and had power to preserve it.

distance from Brown likely had increased from the earlier 1.28 miles because Butler slowed to 40 mph as he passed Indian Route 6011.

Butler did not cause Brown to swerve into oncoming traffic at MP 346.6 where he hit the victims. But a preponderance of the evidence shows that Brown would not have been at MP 346.6, travelling between 92 and 100 mph (according to both sides' experts), without the extended high-speed pursuit by Butler. This is enough to find that, but for Butler's pursuit, Brown would not have hit the Hirayama family, and that the collision was a foreseeable and proximate consequence of the pursuit that caused Brown to flee.

Defendant argues with some force that Brown chose to drive drunk, chose to break the law, chose to flee from police, and crossed the center line and hit the Hirayama family. All of this is true. But the Court cannot conclude that Brown was the only one at fault. The BIA Policy itself recognizes that police pursuits are a use of force, can be very dangerous to the public, and should be terminated when the risk to the public of continuing the pursuit outweighs the risk to the public of letting the suspect flee. Failure to terminate a pursuit in such circumstances contributes to the resulting harm.

Defendant argues that Brown's intoxicated conduct was a superseding event, but the Court cannot conclude that it was "unforeseeable by a reasonable person" in Butler's position. *Dupray*, 432 P.3d at 943. The sergeant had good reasons to suspect the driver of the truck was intoxicated, including his running of the stop sign in Tuba City, his hit-and-run accident, his reckless driving when he almost hit Officer Yellow, and his high-speed weaving in and out of traffic on Highway 160. Nor can the Court find that, "looking backward, after the event, the intervening act appears extraordinary." *Id*. Sadly, the truck driver's reckless acts were quite foreseeable a few minutes into the pursuit. And the BIA Policy's specific considerations for engaging in and continuing a pursuit – including its instruction that in most cases officers should discontinue trying to stop a fleeing vehicle – confirms that the risks were foreseeable.

Defendant also argued that Brown's inability to see Butler during the final minute before the crash was sufficient to break the causal chain. But even if Butler's lights were

out of Brown's field of vision for 56.4 seconds before the crash, as Peles calculated, the Court cannot find that this short time period, after a 24-mile high-speed pursuit that lasted more than 15 minutes, was sufficient to break the causal chain.

### E. Negligence and Wrongful Death Summary.

Sergeant Butler had a duty to comply with the BIA Policy when conducting the pursuit, breached that duty, and contributed to Plaintiff's injury. Plaintiff has also shown that Plaintiff suffered damages, which will be discussed below. Defendant accordingly is liable to Plaintiff for negligence and wrongful death. *Quiroz*, 416 P.3d at 827-28.

## III. Damages.

### A. The FTCA and Arizona Law.

Arizona's wrongful death statute provides that "[w]hen death of a person is caused by wrongful act, neglect or default, . . . the person who . . . would have been liable if death had not ensued shall be liable to an action for damages." *Walsh v. Advanced Cardiac Specialists Chartered*, 273 P.3d 645, 648 (Ariz. 2012) (quoting A.R.S. § 12-611). "The statutory scheme directs that 'the [trier of fact] shall give such damages as it deems fair and just with reference to the injury resulting from the death to the surviving parties who may be entitled to recover, and also having regard to the mitigating or aggravating circumstances attending the wrongful act, neglect or default.'" *Id.* (quoting A.R.S. § 12-613). "[W]rongful death damages are statutorily limited to injuries 'resulting from the death,' § 12-613, which may include the decedent's prospective earning capacity; the loss of companionship, comfort, and guidance caused by the death; and the survivor's emotional suffering, but not the decedent's own pain and suffering." *Walsh*, 273 P.3d at 648 (citing cases).

### B. R.H.'s Economic Loss.

Tomohiro's death deprived R.H. of the economic support she would have received. Plaintiff adopted the testimony of Defendant's expert on economic loss, Paul Bjorkland, and sought $354,000 for lost economic support. Defendant argued that R.H. was entitled

to only $332,000.  Plaintiff also sought $173,919.34 for R.H.'s medical expenses, which Defendant conceded were reasonable and medically necessary.

### 1.    Paul Bjorkland's Opinion.

Bjorkland proposed two figures for R.H.'s total economic injury from Tomohiro's lost support between ages 9 and 18 – $248,145 (about $27,500 a year) and $342,037 (about $38,000 a year).  *See* Tr. at Apr. 19, 2019 at 30-31.  He calculated the first figure based on the assumption that the Hirayama family would have returned to Japan after Tomohiro's work in Illinois ended, eliminating Tomohiro's "ex-pat" benefits, and Tomohiro would have provided economic support to R.H. only until she was 18, the legal age of majority in Arizona.  The second figure was based on Tomohiro's increased annual income if the Hirayama family remained in the United States until R.H. was 18 and received the ex-pat benefits in addition to wages.  Both figures relied on Department of Agriculture statistics on the costs to raise a child at given incomes, and both accounted indirectly for income taxes Tomohiro would have paid.

### 2.    Discussion.

The Court finds it is more likely that the Hirayama family would have returned to Japan after Tomohiro completed his contract in the United States.  Tomohiro had committed to five years in Illinois and had spent three or four years at the Netherlands office before that, but the rest of his 28-year career with Yaskawa had been in Japan. Sachiyo's parents and brother also live in Japan.  The Court will use Bjorkland's higher annual figure for the remaining four years and one month the family would have lived in Illinois, and the lower annual figure for when the family would have lived in Japan.

In determining the number of years Tomohiro would have provided for R.H., the Court will use Japan's age of majority of 20 years, not Arizona's age of 18.  This approach comports with the assumption that the Hirayamas would have returned to Japan and followed its customs.

Defendant argued that the FTCA requires the Court to use Arizona's age of majority, but the Court does not agree.  The FTCA directs the Court to apply Arizona's

substantive law, stating that a defendant may be liable to the extent "a private person[] would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1); *see also Delta Savings Bank*, 265 F.3d at 1024-25.  Arizona's wrongful death statute calls for damages that are "fair and just with reference to the injury resulting from the death to the surviving parties."  A.R.S. § 12-613.

An award of damages requires a factual determination – how much R.H. lost. Defendant cites no case suggesting that an Arizona court would disregard the length of time a father customarily would support his daughter, and certainly no case to suggest that Arizona's age of majority somehow trumps the customs a Japanese family would have followed.  Nor does § 12-613 limit a surviving party's recovery to the cultural and legal norms of Arizona – it calls for fair and just damages.  *See Ahmad v. State*, 432 P.3d 932, 936 (Ariz. Ct. App. 2018) ("Wrongful death is a statutory cause of action, and the statutory scheme provides a very broad base for the measure of damages." (citations and quotation marks omitted)); *Massara v. United States*, No. CV-13-00269-TUC-BPV, 2015 WL 12516695, at *7 (D. Ariz. Apr. 7, 2015) (wrongful death damages are those the trier of fact "deems fair and just with reference to the injury resulting from the death").

Defendant also asserted that R.H.'s economic loss was mitigated by the care she has received from her grandparents.  But Arizona's wrongful death statute references "the mitigating or aggravating circumstances attending the wrongful act," § 12-613, not mitigating circumstances attending the care a survivor receives after the loss.  The statute's text imposes no burden on Plaintiff to disprove mitigation as Defendant seems to suggest. *See* §§ 12-612, 12-613.

Based on Bjorkland's suggested figures, the annual amount spent on R.H.'s care from Tomohiro's higher, ex-pat salary would have been $38,004.11.  The lower annual amount of her care after a return to Japan would have been $27,571.67.[9]

---

[9] The Court arrived at these figures by taking Bjorkland's total damages figures – $248,135 and $342,037 – and dividing by nine, which is the number of years for which he calculated R.H.'s total economic loss.  *See* Tr. at Apr. 19, 2019 at 31.

R.H. will reach majority in Japan on August 24, 2024. The accident occurred on March 28, 2014. Thus, Tomohiro died ten years and five months before the date on which he would have stopped providing financial support to R.H. Four years and one month at the higher annual care figure totals $155,183.45 – the amount Tomohiro would have been spent on R.H's care in the United States. The remaining six years and four months in Japan, at the lower annual care figure, would total $174,619.88. Thus, the total economic loss to R.H. from age 9 to age 20 is $329,803.33.[10] This amount, plus $173,919.34 in R.H.'s medical expenses, results in a total award of $503,722.67 in economic damages.

## C. R.H.'s Non-Economic Loss.

Plaintiff sought $10 million for R.H.'s pain and suffering and the loss of her parents' care, companionship, guidance, and love. Plaintiff did not request non-economic damages for R.H.'s loss of Yuki. Defendant suggested $300,000 for R.H.'s pain and suffering and $1.5 million for the wrongful deaths of her family.

"The wrongful death statute has been liberally construed to allow damages for 'intangible[s] as to which there can be no unanimity of opinion[.]'" *Frank v. Sup. Ct. of State of Ariz., in & for Maricopa Cty.*, 722 P.2d 955, 957 (Ariz. 1986) (collecting cases). "[A]lthough inherently uncertain, wrongful death damages include the loss of family[] love, affection, companionship, consortium, personal anguish, sorrow, suffering, pain and shock[.]" *Thomas* , 2009 WL 792314, at *2 (citing *Lueck*, 535 P.2d at 611-12; *Kemp*, 442 P.2d at 868; *Salinas*, 407 P.2d at 133-34); *see also Ahmad*, 432 P.3d at 934-37 (affirming jury's award of $30 million dollars under § 12-613 where, during a police pursuit, the fleeing suspect killed plaintiffs son and jury apportioned 5% of fault to state).

R.H.'s only remaining family members are her maternal grandfather and grandmother, her maternal uncle, and her paternal grandmother who is in assisted living.

---

[10] The Court divided each annual figure by 12 to arrive at the monthly amount spent on R.H.'s care, and then multiplied the monthly amount by the appropriate number of months to arrive at the total amount spent on care under each of Tomohiro's two salary conditions.

*See* Ex. 146.  Her surviving family members are much older than her, and she faces the prospect of losing several of them before she reaches majority.

R.H. is maturing through adolescence without her mother and father's affection, guidance, and enriching companionship.  R.H. appears to be well-loved by her grandparents, but her loss is vast, especially at this point in her young life when growing children need the care and instruction of their parents.  The evidence was uncontroverted that the Hirayama family was close and loving, and that R.H. held a special space in the family dynamic.

R.H. awoke from the head-on collision surrounded by the bodies of her parents and brother and in extreme pain.  She had a perforated stomach and several fractured bones, and had to undergo emergency surgery.  Months of recovery followed.  For the wrongful deaths and loss of companionship, comfort, love, affection, and guidance of her parents, and for her pain and suffering, the Court finds R.H.'s loss is $10 million.

**D.    Economic Loss to Yuki's Estate.**

Plaintiff adopted Bjorkland's testimony on economic loss to Yuki's estate.  Bjorkland testified that a reasonable figure for loss to Yuki's estate for his future earnings, accounting for income taxes, was $525,000.  Tr. at Apr. 19, 2019 at 40.  Bjorkland's calculation was based on certain assumptions, including that Yuki would attain a bachelor's degree.  The Court finds it more likely than not that Yuki would have attended college as the son of college-educated and successful parents.  The Court will adopt Bjorkland's figure of $525,000 as the damage to Yuki's estate from his untimely death.

**E.    Apportionment.**

The Uniform Contribution Among Tortfeasors Act ("UCATA"), adopted in Arizona, "contemplates and permits the naming of nonparties whose alleged fault the trier of fact may consider in apportioning liability."  *Cramer v. Starr*, 375 P.3d 69, 73 (Ariz. 2016) (quoting A.R.S. § 12-2506(B) and citing Ariz. R. Civ. P. 26(b)(5)).  Defendant has named Brown as a nonparty at fault and Plaintiff has conceded that UCATA applies in this

FTCA action. Plaintiff seeks an allocation of 75-80% fault to Butler. Defendant seeks an allocation of 10% to Butler.

Kee Brown was the primary cause of the accident. He chose to drive intoxicated and flee from a police officer. He crossed the center line and hit the Hirayama family head-on. Butler contributed to the accident, but the Court finds that R.H.'s injuries and the deaths of her family were caused predominantly by Brown. The Court allocates 90% of the fault to Kee Brown and 10% to Defendant.

**IV.    Negligent Infliction of Emotional Distress.**

"Negligent infliction of emotional distress requires that the plaintiff witness an injury to a closely related person, suffer mental anguish that manifests itself as a physical injury, and be within the zone of danger so as to be subject to an unreasonable risk of bodily harm created by the defendant." *Guerra v. State*, 348 P.3d 423, 426 (Ariz. 2015) (quoting *Villareal v. Ariz. Dep't of Transp.*, 774 P.2d 213, 220 (1989)).

R.H. was seriously injured in the accident, but Plaintiff presented no evidence that her mental anguish manifested itself as a physical injury. *Guerra*, 348 P.3d at 426. The Court finds no liability on this claim.

**V.    Conclusion.**

R.H. suffered damages of $503,722 for economic loss and medical expenses and $10,000,000 for the loss of her parents and her pain and suffering. Yuki's estate suffered $525,000 in economic loss. Defendant is liable for 10% of the $11,028,722 in total damages, or $1,102,872.

**IT IS ORDERED** that Defendant shall pay $1,102,872 to Plaintiff. The Clerk of Court is directed to enter judgment in favor of Plaintiff and against Defendant as set forth in this order.

Dated this 16th day of May, 2019.

David G. Campbell
Senior United States District Judge